Case No.: 25-40481

---

In the United States Court of Appeals for The Fifth Circuit
_____

**Martina Pena, Individually, and as next best friend of A.P.; Aristedes Pena, Individually, on behalf of Estate of Alberto Pena, Plaintiffs - APPELLANTS**
**v.**
**Starr County, Texas; Evelario Garza; Ubaldo Suarez; Chester Cervantes; Daniel Garcia; Hector Lopez, III; Joel Garza; Emilio Garza; Jesus Barrera, Jr.; Cesar Juarez, Jr., Defendants - Appellees**

_____

On Direct Appeal from the United States District Court for the Southern District of Texas cause number 7:22-cv-00276, the Honorable Micaela Alvarez presiding.

**Appellant Motion to Extend Time to File Brief**
_____

**James P. Roberts**
Palmer Perlstein
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Phone: 214-987-4100
Facsimile: 214-922-9900
Email: james@palmerperlstein.com
**Counsel for Appellant**

CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Martina Pena Individually, and as Next Friend of A.P.,** (Plaintiff/Appellant);

2. **Aristedes Pena, Individually**, **And on Behalf of the Estate of Alberto Pena** (Plaintiff/Appellant);

3. **James Roberts**, Palmer Perlstein, 15455 Dallas Parkway, Suite 540, Addison, Texas 75001 (Attorney for Appellant at trial);

4. **Scott Palmer**, Palmer Perlstein 15455 Dallas Parkway, Suite 540, Addison, Texas 75001 (Attorney for Appellant at trial);

5. **Starr County, Texas**, (Defendant/Appellee);

6. **Evelario Garza**, (Defendant/Appellee);

7. **Ubaldo Suarez**, (Defendant/Appellee);

8. **Chester Cervantes**, (Defendant/Appellee);

9. **Erasmo Rios Jr.**, (Defendant/Appellee);

10. **Daniel Garcia**, (Defendant/Appellee);

11. **Hector Lopez III**, (Defendant/Appellee);

12. **Javier Gonzalez**, (Defendant/Appellee);

13. **Joel Garza**, (Defendant/Appellee);

14. **Emilio Garza**, (Defendant/Appellee);

15. **Jesus Barrera Jr.**, (Defendant/Appellee);

16. **Cesar Juarez Jr.**, (Defendant/Appellee);

2

17. **Robert Lee Drinkard**, Denton Navarro Rodriguez Bernal Santee & Zech, P.C., 701 East Harrison Ave., Harlingen, Texas 78550 (Attorney for Defendants Starr County, Texas, Evelario Garza, Ubaldo Suarez, Chester Cervantes, Erasmo Rios Jr., Daniel Garcia, Hector Lopez III, Javier Gonzalez, Joel Garza, Emilio Garza, Jesus Barrera Jr., Cesar Juarez Jr., at trial and on appeal);

18. **The Honorable Micaela Alvarez** (United States District Court Judge for trial);

*/s/ James P. Roberts*
James P. Roberts

**Attorney of Record for Appellant Martina Pena, Individually, and As Next Best Friend of A.P., and Aristedes Pena, Individually, And On Behalf of the Estate of Alberto Pena.**

STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument. As this Court has explained, claims involving qualified immunity are fact-intensive and depend on the facts and circumstances of each particular case. Here, the facts – including the video evidence – require a thorough analysis. Oral argument will help develop the factual details in the record before this Court.

## Table of Contents

CERTIFICATE OF INTERESTED PERSONS.................................................................*2*

STATEMENT REGARDING ORAL ARGUMENT ..........................................................*4*

TABLE OF AUTHORITIES ....................................................................................*7*

STATEMENT OF JURISDICTION ..........................................................................*11*

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...............................................*12*

STATEMENT OF THE CASE ................................................................................*13*

SUMMARY OF THE ARGUMENT .........................................................................*16*

ARGUMENT ....................................................................................................*19*

  Appellants' First Issue ................................................................................19
    A.  Standard of Review.............................................................................19
    B.  Law for Summary Judgment................................................................19
    C.  Constitutional Violation for Deliberate Indifference to Medical Needs .20
    D.  Qualified Immunity.............................................................................21

  A.  Defendants Miguel Cervantes and Daniel Garcia .......................................22
    1.  Facts relevant to Defendants Miguel Cervantes and Daniel Garcia........22
    2.  Application of facts to case law ...........................................................26

  B.  Defendants Hector Lopez and Joel Garza .................................................28
    1.  Facts relevant to Defendants Hector Lopez and Joel Garza....................28
    2.  Application of facts to case law ...........................................................33

  C.  Defendants Cesar Juarez and Ubaldo Suarez .............................................35
    1.  Facts relevant to Defendants Juarez and Suarez....................................35
    2.  Application of facts to law ...................................................................37

  H.  Defendant Evelario Garza .......................................................................39
    1.  Facts Relevant to Defendant Evelario Garza.........................................40
    1.  Application of facts to case law ...........................................................41

  I.  Defendants violated clearly established law...............................................43
    1.  Defendants Cervantes, Garcia, Lopez, and Joel Garza...........................43
    2.  Defendants Juarez and Suarez .............................................................46
    3.  Defendant Evelario Garza....................................................................47

Appellants' Second Issue ...................................................................50

A.  Defendant Starr County, Texas .......................................................50

   1.   Monell Liability against Starr County ..................................50

   2.   Facts Relevant to the Monell claims.....................................52

   3.   Application of Facts to Case Law ..........................................56

   i.   Failure to monitor ................................................................56

   ii.   Failure to provide medical care ..........................................60

Appellants' Third Issue......................................................................64

CONCLUSION AND PRAYER ..................................................................65

CERTIFICATE OF SERVICE.....................................................................66

CERTIFICATE OF COMPLIANCE .............................................................66

TABLE OF AUTHORITIES

**CASES**

*Alvarez v. City of Brownsville*,
904 F.3d 382, 390 (5th Cir. 2018) ...................................................................58

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)...................... 19, 20

*Arenas v. Calhoun*,
922 F.3d 616, 624 (5th Cir. 2019) ........................................................ 42, 49, 57

Burge v. St. Tammany Parish,
336 F.3d 363, 373 (5th Cir. 2003) ...................................................................58

*Carlucci v. Chapa*,
884 F.3d 534, 538-40 (5th Cir. 2018) ...............................................................20

*City of Oklahoma City v. Tuttle*,
471 U.S. 808, 823, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985)...................52

*Domino v. Tex. Dep't of Criminal Justice*,
239 F.3d 752, 755 (5th Cir. 2001............................................................... passim

*Dyer v. Houston*,
964 F.3d 374 (5th Cir. 2020) ..................................................................... passim

*Easter v. Powell*,
467 F.3d 459, 463 (5th Cir. 2006) .............................................................. passim

*Est. of Bonilla by & through Bonilla v. Orange Cnty., Tex.*,
982 F.3d 298, 305 (5th Cir. 2020) ........................................................ 20, 37, 50

*Estelle v. Gamble*,
429 U.S. 97, 103 (1976)...................................................................................21

*Evans v. City of Marlin, Texas*,
    986 F.2d 104, 108 (5th Cir. 1993) ...................................................................58

*Farmer v. Brennan*,
    511 U.S. 825, 842, 114 S. Ct. 1970, 1981, 128 L. Ed. 2d 811 (1994).... 21, 38, 39

*Flores v. Cnty of Hardeman, Tex.*,
    124 F.3d 736, 738 (5th Cir 1997) ...................................................................50

*Gobert v. Caldwell*,
    463 F.3d 339, 345 n.12 (5th Cir. 2006) ...................................................... passim

*Goodman v. Harris Cty.*,
    571 F.3d 388, 395 (5th Cir. 2009) .................................................. 41, 42, 48, 59

*Grandstaff v. City of Borger*,
    767 F.2d 161, 171 (5th Cir. 1985) ...................................................................62

*Harlow v. Fitzgerald*,
    457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)............................22

Hope v. Pelzer;
    536 US 730 (2002)...................................................................... 45, 47, 48, 49

*M. D. by Stukenberg v. Abbott*,
    907 F.3d 237, 255 (5th Cir. 2018) ...................................................................51

*Monell v. Dep't of Soc. Servs. of City of New York*,
    436 U.S. 658, 690 (1978)............................................................................ 50, 51

*Montano v. Orange Cnty., Tex.*,
    842 F.3d 865, 875 (5th Cir. 2016) ............................................................ 61, 62

*Moore v. LaSalle Mgmt. Co., L.L.C.*,
    41 F.4th 493, 508 (5th Cir. 2022) .................................................. 21, 33, 34, 45

*Mullenix v. Luna*,
   136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015)..................................................22

*Pena Arita v. United States*,
   470 F. Supp. 3d 663, 703 (S.D. Tex. 2020) .................................................. 57, 59

*Piotrowski v. City of Houston*,
   237 F.3d 567, 578 (5th Cir. 2001) .......................................................51

*Poole v. City of Shreveport*,
   691 F.3d 624, 627 (5th Cir. 2012) .......................................................19

*Sanchez v. Young Cnty., Tex.*,
   866 F.3d 274, 279 (5th Cir. 2017) ............................................... passim

*Shepherd v. Dall. Cty.*,
   591, F.3d 445, 452 (5th Cir. 2009) ............................................... 56, 61

*Sims v. Griffin,*
   35 F.4th 945, 951 (5th Cir. 2022) .......................................................46

*Smith v. Brenoettsy*,
   158 F.3d 908, 911–12 (5th Cir.1998) .................................................41

*Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*,
   310 F.3d 870, 877 (5th Cir. 2002) ................................................ 20, 39, 40, 41

*Thompson v. Upshur Cnty., Tex.*,
   245 F.3d 447, 457 (5th Cir. 2001) ................................................ 20, 37, 43, 44

*Tolan v. Cotton*,
   572 U.S. 650, 655-56, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014) .....................22

**STATUTES**

18 U.S.C. § 3742....................................................................................11

28 U.S.C. § 1291 ......................................................................................................11

**RULES**

FED. R. APP. P. 4(b)(2) ............................................................................................11
FED. R. CIV. P. 56(a) ...............................................................................................19

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

MARTIA PENA, INDIVIDUALLY AS NEXT FRIEND OF A.P. ET AL.,
PLAINTIFFS- APPELLANTS
V.
STARR COUNTY, TEXAS ET AL.
DEFENDANTS - APPELLEES

STATEMENT OF JURISDICTION

1. The jurisdiction of the United States District Court for the Southern District of Texas was founded upon 18 U.S.C. § 3231.

2. The jurisdiction of the United States Court of Appeals for the Fifth Circuit is founded upon 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and is based upon the following particulars:

I.      Date of Judgment: **August 12, 2025**; ROA.5072-5073.

II.     Filing of notice of appeal: **August 14, 2025**. This notice of appeal was timely. FED. R. APP. P. 4(b)(2). ROA.5074-5075

STATEMENT OF ISSUES PRESENTED FOR REVIEW

FIRST ISSUE: The district court erred in granting summary judgment for the individual defendants in this case based on qualified immunity because Appellants raised genuine disputes of material facts as to whether the individual Appellees were deliberately indifferent to Alberto Pena's health and safety in violation of his clearly established Fourteenth Amendment right not to have his serious medical needs met with deliberate indifference, when the individual Appellees were aware that Alberto had struck his head against the inside of the police car and his jail cell door knocking himself unconscious multiple times, yet the individual Appellees failed to summoning medical attention, thereby resulting in his death. This was error.

SECOND ISSUE: The district court erred in granting summary judgment for the County defendant because Appellants raised genuine disputes of material facts as to whether the County maintained unconstitutional policies and practices which caused Alberto Pena's death. This was error.

THIRD ISSUE: The district court erred in dismissing the wrongful death and survival action claims, due to finding no constitutional violations occurred. This was error.

12

STATEMENT OF THE CASE

On August 13, 2020, Alberto Pena ("Alberto") was arrested by Starr County Sheriff's Deputies for the Class B Misdemeanor offense of Criminal Mischief for causing damage to property. Alberto was taken to the Starr County Jail where he would later be found unresponsive and pronounced deceased. Alberto died as a result of head trauma caused when he repeatedly struck his head against the inside of the patrol car and the door of his jail holding cell. Despite the deputies and jailers in this case being aware that Alberto had struck his head hard enough to knock himself unconscious, none of them obtained medical care for Alberto and failed to adequately monitor him, resulting in his preventable death.

This was not the first time a person has died in the Starr County Jail due to guards failing to monitor an inmate in a solitary cell. Sheriff Rene Fuentes was on notice that the practices of not monitoring these inmates would lead to serious injury or death, as the Starr County Jail was found non-compliant with cell checks in 2018 as part of a special inspection when Marco Munoz committed suicide while guards failed to monitor the video of his cell or conduct cell checks according to the Texas Commission on Jail Standards – the same failures which resulted in Alberto's death in this case. Sheriff Fuentes acknowledged in his deposition that these observation policies which were not in compliance with the Texas Minimum Jail Standards resulted in two in-custody deaths – Marco Munoz and Alberto Pena. ROA.3820.

Plaintiffs Martina Pena, individually, and as next best friend of A.P., and Aristedes Pena, individually, and on behalf of the Estate of Alberto Pena filed this lawsuit against Starr County, Texas and each of the individual defendants who worked for Starr County, Texas for the wrongful death of their son and father and for violating Alberto's constitutional rights under the Fourteenth Amendment to the United States Constitution to receive adequate medical care as a pre-trial detainee.

Defendants Miguel Cervantes and Daniel Garcia were present at the scene of the arrest where Alberto knocked himself unconscious in the patrol car; however, they did not provide Alberto with medical care and then did not tell anyone at the jail about his injuries. Defendants Hector Lopez and Joel Garza were working the day shift at the jail and were aware that Alberto knocked himself unconscious in the detox cell by repeatedly slamming his head into the door; however, they did not provide Alberto with medical care. Defendants Cesar Juarez and Ubaldo Suarez were working the night shift at the jail and Defendant Evelario Garza was their supervisor, when Alberto was not adequately monitored while restrained in the restraint chair and died.

On December 12, 2024, Defendants Miguel Cervantes, Evelario Garza, Daniel Garcia, Joel Garza, Cesar Juarez, Hector Lopez, Ubaldo Suarez, and Starr County, Texas filed Motions for Summary Judgment. (ECF 58-65). On February 28, 2025, Plaintiffs filed a consolidated response to Defendants' Motions for Summary

Judgment. (ECF 74). On March 31, 2025, Defendants filed a consolidated Reply to Plaintiffs' Response. (ECF 82). On August 1, 2025, the district court issued an Opinion and Order granting summary judgment for Defendants Cervantes, Evelario Garza, Garcia, Joel Garza, Juarez, Lopez, Suarez, and Starr County, Texas. (ECF 92). On August 5, 2025, Plaintiffs timely notice their appeal. (ECF 93).

## SUMMARY OF THE ARGUMENT

Despite the complexities of qualified immunity, this is a fairly simple case. The summary judgment evidence clearly shows that Alberto Pena struck his head against the inside of the patrol vehicle and against the door of his holding cell, hard enough to knock himself unconscious in both locations. These were not light taps, and the video of the head strikes is shocking. The arresting deputies were aware that he knocked himself unconscious inside of the patrol car yet provided him with no medical care. The jailers were aware that Alberto knocked himself unconscious inside of his cell yet provided him with no medical care. Instead, Alberto was placed in a restraint device where he showed obvious signs of medical distress – inability to breathe, turning purple, foaming at the mouth, yet the jailers provided him with no medical care and failed to monitor him after learning of these symptoms. Alberto then became unresponsive and died.

According to Appellants' expert, Dr. Judy Melinek, the presence of extensive subgaleal hemorrhages in the context of repeated head impacts and witnessed unconsciousness following one of those impacts, with cerebral edema and vascular injury on microscopic sections, indicate that concussive head injury also played a significant role in Alberto's death. ROA.4085. Had Alberto been evaluated for head trauma following the impacts that led him to fall over in the patrol vehicle (per Lieutenant Rios) or fall down and "go unconscious" (per Officer Joel Garza) or

16

"knock himself out" (per Officer Javier Gonzalez) in the jail cell, he would have been sedated for agitation, and his death could have been averted. ROA.4085. Dr. Melinek testified that within reasonable medical probability based on the totality of the circumstances, including the videos, the testimony, and what she saw from the autopsy, that the most likely source of Alberto's traumatic head injury was the head banging that occurred both in the vehicle as well as at the jail. ROA.4169. Dr. Melinek testified that, with a reasonable medical certainty, had Alberto been provided medical attention for all of these issues, he would not have died. ROA.4300.

The summary judgment evidence creates genuine issues of material fact for a jury to decide whether each of the Appellees were on notice of Alberto's serious medical needs when he repeatedly struck his head and was seen by the Defendants (1) unconscious in the backseat of the patrol car, (2) unconscious and dazed on the floor of the detox cell, and (3) struggling to breathe and changing colors as a result of his injuries in the restrain chair. Plaintiffs' Response to the Defendants' Motions for Summary Judgment contained a list of disputed facts with citation to the summary judgment evidence. ROA.3034-3037.

The district court erred by finding that "There is no other summary judgment evidence that Alberto lost consciousness" and "there is no summary judgment evidence that Alberto suffered head trauma, or that he died due to head trauma."

17

ROA.4995. The district court made this finding despite the ample evidence of loss of consciousness and the head trauma causing Alberto's death. The District Court then credited the Appellees versions of events that they did not know Alberto lost consciousness and simply believed he was intoxicated. (ROA.4998-5001). This was error. The district court also erred in finding the law was not clearly established.

The district court erred when it granted summary judgment on the *Monell* claims by finding that the failure to monitor or provide medical care were not the result of policy or custom, as the evidence shows they were. (ECF 92, p. 36).

Finally, the district court erred in granting summary judgment on the wrongful death and survival action claims due to finding no constitutional violation occurred.

For these reasons, Appellants request this Court reverse the district court's order and remand this case for trial.

<u>ARGUMENT</u>

## **Appellants' First Issue**

The district court erred in granting summary judgment for the individual defendants in this case based on qualified immunity because Appellants raised genuine disputes of material facts as to whether the individual Appellees were deliberately indifferent to Alberto Pena's health and safety in violation of his clearly established Fourteenth Amendment right not to have his serious medical needs met with deliberate indifference, when the individual Appellees were aware that Alberto had struck his head against the inside of the police car and his jail cell door knocking himself unconscious multiple times, yet the individual Appellees failed to summon medical attention, thereby resulting in his death. This was error.

### **A. Standard of Review**

This Court reviews summary judgment *de novo*, applying the same standard as the district court. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

### **B. Law for Summary Judgment**

A grant of summary judgment is proper if and only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A dispute is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Poole*, 691 F.3d at 627. A fact is material if its resolution could affect the outcome of the action. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In deciding whether there are genuine disputes of material fact precluding summary judgment, a court must review "all of the evidence introduced," but "all of the factual inferences from the evidence are viewed in a light most favorable to the party opposing the motion." *Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

## C. Constitutional Violation for Deliberate Indifference to Medical Needs

"The Fourteenth Amendment guarantees pretrial detainees a right 'not to have their serious medical needs met with deliberate indifference on the part of the confining officials.'" *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001)). "A government official violates a Fourteenth Amendment right when the official acts with deliberate indifference to a detainee's serious medical needs." *Est. of Bonilla by & through Bonilla v. Orange Cnty., Tex.*, 982 F.3d 298, 305 (5th Cir. 2020). A serious medical condition or need is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." (Emphasis added) *Carlucci v. Chapa*, 884 F.3d 534, 538-40 (5th Cir. 2018) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006)).

"To succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was 'aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists,' and (2) the official actually drew that inference." *Dyer*, 964 F.3d at 380 (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001)). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

"[T]he plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for serious medical needs." *Domino*, 239 F.3d at 756. "A prison guard is deliberately indifferent if he intentionally denies or delays access to medical care." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006). The Fifth Circuit has explained, "[f]ew things could be more self-evident, more within the common knowledge, than that repeated head strikes could cause a fatal head injury." *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 508 (5th Cir. 2022).

### D. **Qualified Immunity**

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional

21

rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). When a defendant moves for summary judgment on the basis of qualified immunity, the district court must decide: (1) whether the facts, taken in the light most favorable to the plaintiff, show the officer's conduct violated a constitutional right; and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct so that a reasonable official in the Appellee's situation would have understood that his conduct violated that right. *See Tolan v. Cotton*, 572 U.S. 650, 655-56, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014).

**A. Defendants Miguel Cervantes and Daniel Garcia**

Defendants Miguel Cervantes and Daniel Garcia were present at the scene of the arrest and were aware Alberto knocked himself unconscious in the patrol car; however, they did not provide Alberto with medical care and did not tell anyone at the jail about his injuries.

1. Facts relevant to Defendants Miguel Cervantes and Daniel Garcia

After being placed into the back of Deputy Cervantes' patrol car, Defendants Rios and Garcia stood next to the car and noticed Alberto striking his head against the interior of the patrol car. ROA.3136; ROA.3219-3220. Defendants Garcia and Rios heard Alberto bang his head against the window. *Id*. When Defendants Garcia

and Rios opened the doors, Alberto was lying on his side unconscious. ROA.3136. Defendant Rios pushed Alberto back into the vehicle and closed the door. ROA.3136. Then, Defendants Garcia and Rios heard a loud thud on the door and opened it to find Alberto had fallen onto his side again. ROA.3136; ROA.3221-3222. Alberto was lying on the backseat of the patrol car unconscious with his eyes closed. ROA.3136; ROA.3222. Due to Alberto being unresponsive, Defendants Garcia and Rios attempted to get a reaction by hollering at him and tapping his face. ROA.3136; ROA.3224-3227; ROA.3230. Alberto was unconscious for a few seconds before being woken up by Defendants Rios and Garcia, as hollering at him did not get a response and they then had to resort to tapping on his face. ROA.3230-3232; ROA.3260-3261. Defendant Garcia testified at his deposition that it looked like Alberto had knocked himself out. ROA.3230-3232. After Alberto woke in response to their hollering and tapping his face, he asked the deputies what had happened and Deputy Rios replied, "you knocked yourself out, you go to quit doing that shit." ROA.3136; ROA.3231-3232. Defendant Garcia testified that after hearing Alberto strike his head against the window, that they opened the door and found Alberto lying on his side with his eyes closed, looking like an alcoholic who was passed out, and required hollering and tapping on his face to get him to respond. ROA.3234-3235. Additionally, in the Computer Aided Dispatch Report, one of Defendant Rios or Defendant Garcia relayed over the radio that "Subject lost consciousness for a

23

few seconds." ROA.4362; ROA.3239; ROA.3242-3243; ROA.4354. When questioned why the CAD Incident Report would say "per 125, subject lost consciousness for a few seconds" Sheriff Fuentes explained that it means the officer saw the suspect unconscious for a few seconds. ROA.3860.

While speaking to Alberto's father, Defendant Cervantes heard Alberto banging his head against the inside of the patrol car. ROA.4364; ROA.3138 at 6:25-6:40; ROA.3169. Defendant Cervantes' body camera video captured his discussion with Defendant Rios. ROA.3138 at 6:45-7:10. As Defendant Cervantes was approaching the vehicle, Defendant Rios waved both of his arms like a boxing referee indicating Alberto was knocked out. ROA.3138 at 6:45-6:49. Defendant Rios then told Defendant Cervantes, "He was banging his head," referring to Alberto banging his head on against the window of the patrol car. ROA.3138 at 6:53. Defendant Cervantes responded, "Yeah, I saw." ROA.3138 at 6:55. Defendant Rios then stated, "I think he knocked out already, I think he knocked out. We need to get EMS." ROA.3138 at 6:56-7:00. Defendant Cervantes agreed and responded, "Yeah." ROA.3138 at 7:01; ROA.3170. Defendant Garcia testified that he and Defendant Rios were standing next to each other when interacting with Alberto and had the same perspective due to looking at him from essentially the same spot outside of the car and would have seen the same things when looking at Alberto. ROA.3244.

However, no medical care was provided for Alberto despite the fact that Defendants Cervantes, Garcia, and Rios knew he knocked himself unconscious by striking his head multiple times. ROA.3254-3259; ROA.3171-3172; ROA.3176. Defendant Garcia testified he was aware that head injuries could be serious and that someone who loses consciousness should be given medical attention – even if they come back to consciousness – because of the loss of consciousness. ROA.3257-3258; ROA.3267.

Instead, Alberto was transported to the jail. ROA.3172. After Defendant Cervantes left the location with Alberto in the backseat of his patrol vehicle, Defendant Cervantes contacted Defendants Rios and Garcia by radio and stated that Alberto was again hitting his head on the passenger door window. ROA.3172-3173; ROA.0042; ROA.3136. Defendant Cervantes told Defendants Rios and Garcia that he was going to pull the car over to the side of the road so that they could secure Alberto. ROA.3136. Defendant Rios made the decision to ride in the backseat of Defendant Cervantes' patrol car with Alberto to keep him from striking his head against the window any further. ROA.3251.

When Defendants Cervantes, Rios, and Garcia got Alberto to the Starr County Jail, they did not inform the jailers that Alberto had struck his head against the window in the patrol car numerous times, that he had knocked himself unconscious by doing so, or that he had not received any medical attention to ensure he was

alright. ROA.3256-3257; ROA.3176-3177; ROA.3403-3405; ROA.3410; ROA.3313-3314; ROA.3317-3318; ROA.3950; ROA.3144 at 2:00-2:09. As a result, Alberto was not provided medical care at the jail for the head injury he had caused himself in the patrol car. ROA.3410-3411; ROA.3415-3419.

An affirmative answer to the question regarding if Alberto suffered recent concussion or loss of consciousness would have required further screening by medical at the jail. *Id*. Defendant Jailer Joel Garza was the jailer who booked Alberto into the Starr County Jail. ROA.3403; ROA.3144 at 4:20-4:24. On the Screening Form completed with Alberto, Defendant Joel Garza marked that Alberto had not suffered a loss of consciousness. ROA.4351; ROA.3410. If Defendants Cervantes, Rios, or Garcia would have informed Defendant Lopez that Alberto had knocked himself unconscious in the backseat of the patrol vehicle, this information would have been passed to Defendant Joel Garza and the answer on that form would have been affirmative to the question regarding a loss of consciousness. ROA.3410-3411; ROA.3950.

2. Application of facts to case law

Prior to this incident, the Fifth Circuit, in denying qualified immunity, found that when officers transporting an arrestee to jail – and officers following the transporting officer's vehicle – know that the arrestee has self-inflicted head injuries from banging his head against the patrol car while in the backseat and those officers

26

don't provide medical care or inform the jail staff of the self-inflicted head injuries, a reasonable jury can find their conduct to be deliberately indifferent to the arrestee's health and safety. *Dyer v. Houston*, 964 F.3d 374 (5th Cir. 2020).

Here, just like in *Dyer*, Defendants Cervantes and Garcia were the arresting officers who witnessed their arrestee, Alberto, strike his head multiple times against the interior of the vehicle. ROA.3136; ROA.3950; ROA.3138 at 6:25-6:40; ROA.3169. In this case, making an even stronger argument for deliberate indifference, Defendants Cervantes and Garcia were actually aware that Alberto knocked himself unconscious due to striking his head. ROA.3138 at 6:25-7:10; ROA.4362; ROA.3136; ROA.3170. Just like in *Dyer*, Defendants Cervantes and Garcia sought no medical care for Alberto. ROA.3254-3255; ROA.3171-3172; ROA.3258-3259; ROA.3176. Further, just like in *Dyer*, Defendants Cervantes and Garcia failed to relay Alberto's head strikes or loss of consciousness to jail staff resulting in no medical care being provided upon book-in to the jail. ROA.3256-3257 ; ROA.3176-3177 ; ROA.3403-3405; ROA.3410 ; ROA.3313-3314; ROA.3317-3318; ROA.3950.

Just like in *Dyer*, here, a reasonable jury could find that Alberto's injuries— from which he would die within roughly 7 hours – were so severe, and their cause so plainly evident to the Officers, that the Officers acted with deliberate indifference

by failing to seek medical attention and by failing to inform jail personnel about the injuries. *Dyer*, 964 F.3d a 381-82.

The district court erred in granting Defendants' motion for summary judgment.

### B. Defendants Hector Lopez and Joel Garza

Defendants Hector Lopez and Joel Garza were working the day shift at the jail and were aware that Alberto knocked himself unconscious in the detox cell; however, they did not provide Alberto with medical care.

1. Facts relevant to Defendants Hector Lopez and Joel Garza

Alberto was placed in the detox cell in the Starr County Jail. ROA.3144 at 4:10-4:19. Alberto banged his head against the plexiglass window in the cell door hard enough to get the attention of the inmate in the holding cell nearby and the officers in the front picket down the hall. ROA.3139 at 21:17; 21:50; 22:11 ROA.3140 at 12:10; 12:45; 13:03. Alberto struck himself hard enough causing him to fall into the wall dazed. ROA.3140 at 12:10 – 13:03. Lopez acknowledged in his deposition that being "dazed" is a sign that someone would need medical attention. ROA.3321. Alberto struck his head against the plexiglass window so hard and loud that it caused Defendants Lopez, Gonzalez, and Joel Garza to go to the cell to check on him. ROA.3139 at 21:17-22:20; ROA.3326. While these three Defendants were standing in front of his cell looking at him through the plexiglass window, Alberto

once again banged his head against the window. ROA.3139 at 21:17-22:20; ROA.3140 at 13:03. Defendants Lopez, Gonzalez, and Joel Garza entered the cell; however, Alberto was not provided medical care for the head injury he just caused himself when he struck his head three separate times against the plexiglass window of his cell door causing Defendants Lopez, Gonzalez, and Garza to come check on him. ROA.3139 at 21:17-22:20; ROA.3140 at 12:10; 12:45; 1303; ROA.3328.

After being booked into the jail, Alberto was again housed in the detox cell, where at 5:38 PM, he struck his head against the plexiglass window of his cell door **FOURTEEN** times. ROA.3140 at 2:15:27-2:15:43; ROA.3139 at 2:24:35-2:24:50. Defendant Lopez referred to these head strikes as an "excessive amount of times." ROA.3326. Alberto struck his head so hard that it rattled the windows of the front picket down the hall where the jailers were stationed. ROA.3139 at 2:24:35-2:24:50. When Alberto struck his head against the window fourteen times, he knocked himself unconscious on the floor of his cell. ROA.3140; ROA.3139 at 2:24:49. Defendant Lopez saw that Alberto dropped to the ground after slamming his head 14 times against the cell door – testifying that Alberto "collapsed as if he was like tired." ROA.3327; ROA.3331. After entering the cell, Defendant Lopez saw Alberto on the ground, tapped Alberto with his foot, and then used both hands to roll Alberto over on the ground. ROA.3140 at 2:16:00-2:16:10. Defendants Lopez, Gonzalez, and Garza all saw Alberto on the ground after he slammed his head against the cell

door fourteen times. ROA.3140 at 2:16:25. Alberto struck his head so hard that Defendant Gonzales stated during his Texas Ranger interview that he heard the banging all the way in the front of the jail where he was helping a medical officer with other inmates. ROA.3143 at 8:04-8:32. The medical office where Defendant Gonzales heard these bangs is a **three-minute run** from the cell where Alberto was banging his head, indicating that Alberto was slamming his head with extreme force. ROA.3659. Defendant Lopez can be seen in the surveillance video footage laughing as he walked over to Alberto's cell. ROA.3139 at 2:25:05-2:25:10. Defendants Joel Garza and Gonzalez joined Defendant Lopez in the detox cell to check on Alberto. ROA.3139 at 2:25:10-2:25:30; ROA.3326. Shockingly, Alberto was not provided medical attention for the head injury he caused himself when he struck his head fourteen times against the window of his cell knocking himself unconscious on the ground. ROA.3328-3329. Alberto was not provided medical care despite there being a medical officer and a doctor at the jail at this time. ROA.3391-3392; ROA.3340.

During his Texas Ranger interview, Defendant Lopez stated that Alberto did not lose consciousness and that he would have sent Alberto to the emergency room if he saw Alberto lose consciousness. ROA.3144 at 5:45-5:50. However, in Defendant Gonzalez's Texas Ranger interview, he stated when he asked what happened, Defendant Lopez responded, "this guy started hitting his himself and he knocked himself out real bad." ROA.3143 at 8:50-9:03. Defendant Gonzales asked

Defendant Lopez "what do you want to do" and Defendant Lopez said "lets just leave him here." ROA.3143 at 9:05-9:10. Defendant Gonzalez explained in that interview with the Texas Ranger that they walked back to the picket and he asked Defendant Lopez what happened and Defendant Lopez said, "he hit himself more than ten times" and Defendant Gonzalez said "yeah I heard the loud banging from the medical office" and Defendant Gonzalez then asked "did he really knock himself out" and Defendant Lopez said "yeah he really knocked himself out." ROA.3143 at 11:08-11:30. Defendant Gonzales then stated during his Texas Ranger interview that he then went back to the medical office and Medical Officer Schwarz asked what the loud banging was and Defendant Gonzales told him it was the guy in detox (referring to Alberto) and Schwartz asked if he knocked himself out and Defendant Gonzales told him yeah Alberto knocked himself out. ROA.3143 at 11:30-12:00.

Defendant Lopez admitted during his deposition that he may have told Defendant Gonzalez that Alberto knocked himself out. ROA.3297; ROA.3332-3333. Defendant Lopez also states that if Alberto knocked himself out, then Defendant Lopez would have taken him to the emergency room. ROA.3335-3336; ROA.3144 at 5:45-5:50. This appears to be the same strategy that the deputies from the scene of the arrest employed – admitting that they would have given Alberto medical care if he was unconscious from his head banging but claiming that he didn't

knock himself unconscious despite acknowledging that he did at the time of the incident. ROA.313 at 6:25-7:10; ROA.4362; ROA.3136; ROA.3170.

Defendant Joel Garza stated during his interview with the Texas Ranger that Alberto really "banged his head to the point where he literally fell on the floor, and he looked like he was unconscious." (ROA.3142 at 13:12-13:20); "he fell to the floor, like he was really hurting himself." (ROA.3142 at 7:40-7:50); and "was really banging his head because I was across the jail, and you could literally hear the bangs." (ROA.3142 at 13:27-13:34).

Defendant Suarez stated during his recorded interview with Deputy Angel Sosa on the day of Alberto's death that when "passing traffic," Defendant Lopez stated that Alberto "was banging his head on the wall to the point where he knocked himself out." ROA.3141 at 6:30-6:39. Defendant Lopez also admitted during his deposition that he may have told Defendant Suarez that Alberto knocked himself out. ROA.3333.

Additionally, the video footage from the Starr County Jail shows Alberto fall to the ground after banging his head fourteen times against the plexiglass and when the door is opened, Alberto' body is lying motionless on the ground unconscious. ROA.3140 at 2:16:00-2:16:10.

Accordingly, the evidence shows that Alberto did in fact knock himself unconscious when he banged his head fourteen times against the window of his cell,

contrary to what Defendant Lopez attempted to tell the Texas Ranger during his interview. ROA.3142 at 13:12-13:20; ROA.3143 at 11:08-11:30; ROA.3140 at 2:15:27-2:15:43; ROA.3139 at 2:24:35-2:24:50. Because Defendants Lopez, Gonzalez, and Joel Garza were aware that Alberto had banged his head over fourteen times into the window of his cell knocking himself unconscious (after banging his head against the door three times earlier in the day), they were all aware that Alberto needed medical attention for a possible and likely head injury as a result of his self-harming behavior. ROA.3335-3336; ROA.3144 at 5:45-5:50.

## 2. Application of facts to case law

The Fifth Circuit has found that knowledge of head strikes causing a lack of consciousness is enough to allow a reasonable jury to find deliberate indifference. *Moore*, 41 F.4th at 502–03. The Fifth Circuit in *Moore* focused on the fact that the individual defendants were aware of Moore striking his head against the floor and that Moore had gone unconscious. *Id.* (Explaining that "Runner, Williams, Hardwell, and Curley all witnessed Moore strike his head on the prison's concrete floor repeatedly", "All of the Individual Defendants later observed Moore unconscious.", "And yet, not one of these Defendants sought medical care for Moore."). The Fifth Circuit held that "a reasonable jury could find on this record that each Individual Defendant actually inferred that a substantial risk of serious

33

harm existed. Again, each one of them had personal knowledge that Moore had gone unconscious after suffering strikes to his head." *Id*.

Those are literally the same facts that we have in this case with regard to Defendants Lopez and Joel Garza (and Defendants Cervantes and Garcia) – except instead of the floor, it was the cell door (and inside of the patrol car) that they knew Alberto repeatedly struck his head against. The hard cell door (or patrol car) in place of the hard floor should make no difference. Just as in *Moore*, because Defendants Lopez and Joel Garza failed to provide or summon medical care despite being aware that Alberto struck his head repeatedly and then lost consciousness, a jury could find that Defendants Lopez and Joel Garza were deliberately indifferent to Alberto's health and safety. *Moore*, 41 F.4th at 502–03.

Additionally, at the time Defendants Lopez and Joel Garza denied Alberto medical care, the law was clearly established that an inmate could demonstrate a constitutional violation by showing that a prison official "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Easter*, 467 F.3d at 465 (quoting *Domino*, 239 F.3d at 756). And as the Fifth Circuit expressly stated in *Moore*, "[f]ew things could be more self-evident, more within the common knowledge, than that repeated head strikes could cause a fatal head injury." *Moore*, 41 F.4th at 508.

34

Accordingly, the summary judgment evidence demonstrates facts that would allow a reasonable jury to find that Defendants Lopez and Joel Garza acted with deliberate indifference to Alberto's medical care when they were aware of Alberto's 17 head strikes, aware that Alberto lost consciousness, and yet still refused to provide him medical care or summon medical personnel.

Thus, the district court erred in granting Defendants' motion for summary judgment.

## C. **Defendants Cesar Juarez and Ubaldo Suarez**

Defendants Cesar Juarez and Ubaldo Suarez were working the night shift at the jail where Alberto was not adequately monitored while restrained in the restraint chair and died. Defendants Juarez and Suarez witnessed Alberto in distress and provided no care.

### 1. Facts relevant to Defendants Juarez and Suarez

Defendant Lopez ordered that Alberto be placed into a restraint system known as the WRAP. ROA.3308. Defendant Lopez testified that during the shift change, he informed Defendant Sergeant Evelario Garza about Alberto banging his head inside of the detox cell and that Alberto "hit himself in the head plenty of times." ROA.3334-3335.

During the night shift, and after being placed into restraints, Alberto began yelling that needed help. ROA.3725. Alberto's cousin, Edgar Pena, was also an

35

inmate in the Starr County Jail and could hear Alberto yelling for help. ROA.3725. Edgar was taken down to Alberto's cell to try to help calm Alberto down. ROA.3727. The guards that were present at Alberto's cell with Edgar were Emilio Garza, Jesus Barrera, Cesar Juarez, and Ubaldo Suarez. ROA.3503.

Alberto was turning purple, complaining he could not breathe, and begging for help. ROA.3727-3728; ROA.3743. Alberto had foam coming out of his mouth. ROA.3744. Edgar pleaded for the guards to help Alberto by at least loosening the restraints and pointed out to them that Alberto was turning purple. ROA.3728; ROA.3746-3747. However, the guards refused, despite each of the guards hearing the interaction between Alberto and Edgar because they were standing next to Edgar and could hear what was going on. ROA.3734-3735; ROA.3648; ROA.3650; ROA.3566-3567. Additionally, each of the guards saw Alberto was turning purple because they were standing next to Edgar and could see Alberto just the same as Edgar could. ROA.3734-3735; ROA3648; ROA.3650; ROA.3566-3567. Instead of getting Alberto medical care, the guards left Alberto alone in the cell without providing any type of medical attention. ROA.3577; ROA.3507.

The guards did not monitor Alberto doing face-to-face observations as required by the Texas Commission on Jail Standards. ROA.4358. Later, after a check that exceeded the Texas Commission on Jail Standards monitoring requirements, Alberto was found unresponsive in the WRAP chair with foam on his mouth and

36

purplish skin coloration – just as Edgar had pointed out earlier when he was outside of Alberto's cell. ROA.3654-3656. Alberto died that day after pleading for help and receiving none.

The State of Texas has specific standards for correctional facilities monitored by the Texas Commission on Jail Standards (TCJS). One of those standards, TCJS Rule 273.6 Restraints is specifically applicable in this case. ROA.3963. An inspection of the Starr County Jail was conducted on 09/25/2020 by the Texas Commission on Jail Standards. ROA.4358; ROA.3964. During the inspection noncompliance was noted due to Face-to-face observations not being conducted within 15 minutes as required at the time Alberto was found unresponsive in the WRAP restraint system. ROA.4358; ROA.3964.

2. Application of facts to law

Alberto "had a clearly established right 'not to have [his] serious medical needs met with deliberate indifference on the part of the confining officials.'" *Bonilla*, 982 F.3d at 307 (quoting *Dyer*, 964 F.3d at 380); see also *Thompson*, 245 F.3d at 457. At the time Defendants Suarez and Juarez denied Alberto medical care by ignoring his complaints and refusing to provide him medical attention, the law was clearly established that an inmate could demonstrate a constitutional violation by showing that a prison official "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would

clearly evince a wanton disregard for any serious medical needs.'" *Easter*, 467 F.3d at 465 (quoting *Domino*, 239 F.3d at 756).

A serious medical need is one for which treatment has been recommended or for which the need is <u>so apparent that even laymen would recognize that care is required</u>. (emphasis added) *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). The requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S. Ct. 1970, 1981, 128 L. Ed. 2d 811 (1994). <u>Additionally, as the Supreme Court explained, an official does not escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to a detainee's safety, he did not know the specific cause of the injury</u>. (emphasis added) *Id*. at 843. Furthermore, it does not matter whether the risk comes from a single source or multiple sources. *Id*. at 843.

Alberto's symptoms make it so apparent that even laymen would recognize that care is required. *Gobert*, 463 F.3d at 345. Which is exactly what happened when Edgar – a layman – acknowledged that Alberto needed medical care. ROA.3728; ROA.3746-3747. Further, an official's actual knowledge of a substantial risk may be inferred if the "substantial risk" was obvious. *Easter*, 467 F.3d at 463. What could be more obvious that someone needs help than when someone's skin color is changing, they are foaming at the mouth, and they are having breathing issues?

38

Possibly when someone knocks themselves unconscious by banging their head repeatedly, but either way, what Defendants Juarez and Suarez were aware of – changed skin color, foaming at mouth, inability to breathe – were obvious signs of the need for medical care; thus, their actual knowledge of the substantial risk can be inferred. *Id.*

Furthermore, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Accordingly, to the extent that this is a genuinely disputed issue, it must be resolved by a jury, as at this stage of the proceedings, all of the evidence and all of the factual inferences from the evidence are viewed in a light most favorable to Plaintiffs. *Terrebonne Par. Sch. Bd.*, 310 F.3d at 877; *Saucier*, 533 U.S. at 201.

Accordingly, the district court erred in granting their motion for summary judgment.

### H. <u>Defendant Evelario Garza</u>

Defendant Evelario Garza failed to ensure his subordinate jailers were adequately monitoring Alberto, which lead to extended period of inattention and his death.

1. <u>Facts Relevant to Defendant Evelario Garza</u>

Defendant Evelario Garza was the sergeant on the night shift. ROA.3334-3335. As such, it was Defendant Evelario Garza's job to enforce the 15-minute checks or at least have someone monitoring video of the solitary cells, and neither of those tasks were performed. ROA.4360; ROA.3964-3965. Defendant Evelario Garza's knowing failure to abide by the cell check intervals set out by the Texas Commission on Jail Standards was a failure of supervision.

The Texas Commission on Jail Standards requires a "documented observation" of detainees like Alberto who was restrained in the WRAP to be conducted every 15 minutes to check "the security of the restraints and the circulation to the extremities." ROA.4358; ROA.3964-3965. It was obvious or highly predictable that a failure to monitor these cameras and failure to comply with the 15-minute cell checks will result in a detainee who becomes nonresponsive to go untreated for extended periods of time – just like with what happened to Alberto in this case. *Id*.

Additionally, this was not the first time that the failure to monitor inmates according to the Texas Commission on Jail Standards resulted in an inmate's death at the Starr County Jail. ROA.4360; ROA.3806-3807; ROA.3808-3813; ROA.3819-3820. When Marco Munoz died on May 13, 2018, in the Starr County jail, the Texas Commission on Jail Standards cited Starr County for failing to conduct 30-minute

face-to-face observations on Mr. Munoz – resulting in an extended period before he was found. ROA.4360; ROA.3806-3807. Sheriff Fuentes acknowledged in his deposition that Starr County's inadequate observation policies which were not in compliance with the Texas Minimum Jail Standards resulted in two in-custody deaths – Marco Munoz and Alberto Pena. ROA.3820. Thus, there is a pattern of failing to monitor inmates who require increased monitoring due to mental status or restraints, resulting in their deaths. *Id*.

   1. Application of facts to case law

   In a § 1983 claim for failure to supervise or train, the plaintiff must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir.1998). "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. (quoting *Smith*, 158 F.3d at 912.). While it is well established that an officer's failure to follow prison rules, standing alone, does not warrant relief, "a knowing failure to execute policies necessary to an inmate's safety

41

may be evidence of an officer's deliberate indifference." *Arenas v. Calhoun*, 922 F.3d 616, 624 (5th Cir. 2019).

Here, Defendant Evelario Garza failed to supervise his jailers when he allowed them not to adequately monitor Alberto. *Goodman*, 571 F.3d at 395; ROA.3334-3335; ROA.4358; ROA.3964-3965.

A causal link existed between the failure to supervise, and the violation of Alberto's rights. Video footage shows that Alberto stopped moving at 9:01 p.m. ROA.3139 at 5:44:57. But Alberto was not discovered to be unresponsive until a cell check at 9:12 p.m. ROA.3139 at 5:56:10. If Garza's supervision had met minimum standards, Alberto would have been found nonresponsive and would have received medical attention 4 minutes earlier at 9:08 p.m. *Goodman*, 571 F.3d at 395; ROA.4358. Alberto still had a weak pulse when he was finally provided CPR; thus, earlier monitoring and intervention could have saved Alberto. ROA.3141 at 16:25-16:42. Defendant Juarez told Deputy Sosa on the day of the incident that after they started doing CPR Alberto's skin tone changed. ROA.3141 at 16:45-16:53. As the district court noted in its November 8, 2022, Order, "[i]n a case like this, the timing of medical attention plausibly makes a difference, and Plaintiffs' showing of delay states a claim for causation." ROA.236.

Accordingly, Plaintiffs have shown that Defendant Evelario Garza was deliberately indifferent in his supervision of the jailers under his watch, when he did

not ensure they were performing adequate monitoring of Alberto – resulting in Alberto's death; thus, Defendant Evelario Garza's motion should be denied.

## I. **Defendants violated clearly established law**

### 1. Defendants Cervantes, Garcia, Lopez, and Joel Garza

On August 13, 2020, it was clearly established that refusing to provide medical care for a pretrial detainee who repeatedly struck his head against a hard surface causing himself to lose consciousness violated that pretrial detainee's Fourteenth Amendment rights. *Dyer*, 964 F.3d at 380; *Thompson*, 245 F.3d 447; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345.

Prior to the date of this incident, the Fifth Circuit, in denying qualified immunity, found that when officers know that an arrestee has self-inflicted head injuries from banging his head those officers don't provide medical care, a reasonable jury can find their conduct to be deliberately indifferent to the arrestee's health and safety. *Dyer*, 964 F.3d 374. This clearly established law does not only apply to the arresting officers – but also to jailers with custody over a pre-trial detainee. How absurd the rule would be for this law to apply only to the officers bringing Alberto into the jail but not the correctional officers inside of the jail. Accordingly, *Dyer* clearly establishes the constitutional violation in this case not only as they relate to Defendants Cervantes and Garcia but also as they relate to Defendants Lopez and Joel Garza. So does the case which *Dyer* relied upon:

43

*Thompson*, 245 F.3d 447. The Fifth Circuit in *Dyer* explained the relevance of

*Thompson* well,

> *Thompson* defines clearly established law in sufficient detail to have notified the Officers that their actions were unconstitutional. *See*, *e.g.*, *Morgan*, 659 F.3d at 372 (controlling precedent must define pertinent right "with a high degree of particularity"). **Similar to the jail sergeant in *Thompson*, here the Officers had custody of a delusional detainee who was severely harming himself, and yet—despite being aware of the detainee's dire condition—they did nothing to secure medical help**. Arguably, this situation presents a clearer case of deliberate indifference than *Thompson*. There, although providing Thompson some care, the jailer recklessly misjudged the severity of Thompson's condition that led to the seizure that caused his death. 245 F.3d at 453–54, 463–64. Here, the Officers actually witnessed Graham violently slamming his head against the patrol car over and over again, inflicting the cerebral trauma that would kill him within about a day's time. And yet, instead of seeking medical assistance, the Officers deposited Graham at the jail, told jailers nothing about what Graham had done to himself en route, and informed the jail sergeant only that Graham "had been medically cleared at the scene." In sum, *Thompson* gave officers "fair warning," *Morgan*, 659 F.3d at 372, that their behavior was deliberately indifferent to Graham's serious medical needs.

*Dyer*, 964 F.3d at 384–85.

Just as *Thompson* gave the officers fair warning in *Dyer*, *Thompson* also gave

the Defendants in this case fair warning. *Dyer*, 964 F.3d at 384–85; *Thompson*, 245

F.3d 447. Additionally, at the time Defendants denied Alberto Pena medical care,

the law was clearly established that an inmate could demonstrate a constitutional

violation by showing that a prison official "'refused to treat him, ignored his

complaints, intentionally treated him incorrectly, or engaged in any similar conduct

that would clearly evince a wanton disregard for any serious medical needs.'"

44

*Easter*, 467 F.3d at 465 (quoting *Domino*, 239 F.3d at 756). This is clearly what transpired in this case.

Further, the Supreme Court has explained that in an "obvious case," the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances. *Hope v. Pelzer* ; 536 US 730 (2002). (noting in a case where the Eighth Amendment violation was "obvious" that there need not be a materially similar case for the right to be clearly established). It is obvious here, that when a deputy or jailer fails to provide medical care when he is aware that a pretrial detainee has repeatedly struck his head against a hard surface causing himself to lose consciousness, the pretrial detainee's Fourteenth Amendment rights will be violated. *Dyer*, 964 F.3d at 380; *Moore*, 41 F.4th at 502-03; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. The consequence of not doing so is that the pre-trial detainee will suffer severe injuries that left untreated can result in his death. *Moore*, 41 F.4th at 508 ("Few things could be more self-evident, more within the common knowledge, than that repeated head strikes could cause a fatal head injury."). As a deputy or jailer, to stand by and do nothing after watching a person under your control repeatedly slam their head until unconscious is obviously a constitutional violation. Accordingly, this is an obvious case which is clearly established under *Hope*. *Hope*, 536 U.S. at 738.

45

Thus, the district court erred in finding Defendants are entitled to qualified immunity.

2. Defendants Juarez and Suarez

The Fifth Circuit has held that language from *Easter* clearly established a violation of a detainee's rights such that qualified immunity would not apply to officers who ignored him while he died of a drug overdose in the jail. *Sims v. Griffin,* 35 F.4th 945, 951 (5th Cir. 2022). In *Sims*, the officers knew that the detainee was in distress, ignored his cries for help, and refused to seek medical assistance for him. *Id.* at 952. ("[A] reasonable jury could conclude on the evidence at this stage that each officer knew Qualls had swallowed a bag full of drugs, vomited multiple times, screamed for help, pleaded to go to the hospital, and had steadily deteriorated since his arrival at the jail. Further, a reasonable jury could conclude that no officer sought medical assistance for Qualls. In other words, a reasonable jury could find that the officers each refused to treat Qualls, ignored his cries for help, and overall evinced a wanton disregard for Qualls's serious medical needs."). There, the officers were on notice of the unlawfulness and unreasonableness of their conduct when they "had a front-row seat to [the detainee's] agonizing demise but did *nothing* to stop it." (emphasis in original) *Id.* at 952.

Like in *Sims*, *Easter* clearly establishes that Defendants Suarez and Juarez were deliberately indifferent to Alberto's medical care when they saw that he was

46

turning purple, had foam on his mouth, and was in distress from an inability to breathe. ROA.3734-3735; ROA.3658; ROA.3650; ROA.3566-3567. Defendants Suarez and Juarez clearly refused to treat him (or summon someone that could), ignored his complaints (and the ones being made on his behalf by his cousin Edgar), and evinced a wanton disregard for his serious medical needs by leaving him in his distressed state unattended until he became non-responsive. Accordingly, they were deliberately indifferent to Alberto's medical needs. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345.

Further, the Supreme Court has explained that in an "obvious case," the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances. *Hope*, 536 U.S. at 738. It is obvious here, that when a jailer is aware that a pre-trial detainee is turning purple, foaming at the mouth, and unable to breathe yet does nothing to provide that detainee with medical attention, then the pretrial detainee's Fourteenth Amendment rights will be violated. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345; *Hope*, 536 U.S. at 739. Accordingly, this is an obvious case which is clearly established under *Hope*. *Hope*, 536 U.S. at 738.

Thus, the district court erred when it found Defendants Juarez and Suarez are entitled to qualified immunity.

3.  Defendant Evelario Garza

The Fifth Circuit has determined that a constitutional violation exists for failure to supervise, if it is shown that: "(1) the supervisor failed to supervise the subordinate official; (2) a causal link exists between the failure supervise and the violation of the plaintiff's rights; and (3) the failure to supervise amounts to deliberate indifference." *Goodman*, 571 F.3d at 395. The Supreme Court has explained that general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful." *Hope*, 536 U.S. at 739. Accordingly, the fact that Plaintiffs have shown the elements of a failure to supervise claim outlined by the Fifth Circuit in *Goodman* demonstrates that Defendant Evelario Garza violated clearly established law. *Goodman*, 571 F.3d at 395; *Hope*, 536 U.S. at 739.

Further, the Supreme Court has explained that in an "obvious case," the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances. *Hope*, 536 U.S. at 738. It is obvious here, that when a jail supervisor fails to ensure that a pre-trial detainee – restrained in a restraint system – is adequately monitored by his subordinates according to minimum jail standards, the pretrial detainee's Fourteenth Amendment rights will be violated. *Goodman*, 571 F.3d at 395; *Hope*, 536 U.S. at 739. This is

because the "knowing failure to execute policies necessary to an inmate's safety may be evidence of an officer's deliberate indifference." *Arenas*, 922 F.3d at 624. The consequences here were obvious, as a prior death in the Starr County Jail came about due to the same failure to supervise. ROA.4360; ROA.3806-3813; ROA.3819-3820. Accordingly, this is an obvious case which is clearly established under *Hope*. *Hope*, 536 U.S. at 738.

Thus, the district court erred when it found Defendant Evelario Garza is entitled to qualified immunity.

**Appellants' Second Issue**

The district court erred in granting summary judgment for the County Appellee because Appellant raised genuine disputes of material facts as to whether the County Appellee maintained unconstitutional policies and practices which caused Alberto Pena's death. This was error.

### A. Defendant Starr County, Texas

#### 1. *Monell* Liability against Starr County

Municipalities and other local governments are "persons" within the meaning of Section 1983 and can therefore be held liable for violating a person's constitutional rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Bonilla*, 982 F.3d at 308.

Plaintiffs invoked two alternative theories of liability against Starr County for the death of Alberto: the "episodic acts and omissions" of County jailers, and the unconstitutional "conditions of confinement" at the County jail. *See Flores v. Cnty of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir 1997). Plaintiffs' episodic acts and omissions theory "requires a finding that particular jailers acted or failed to act with deliberate indifference to the detainee's needs" and—notably—that this conduct is attributable to the enforcement of a municipal policy, practice, or custom. *Sanchez v. Young Cnty., Tex.*, 866 F.3d 274, 279 (5th Cir. 2017). Plaintiffs' conditions of confinement theory, in contrast, does not rest on the fault of individual jailers. *Id.*

Rather, it challenges the conditions, practices, rules or restrictions of pretrial confinement imposed by Defendant Starr County that, together, "impose[] what amounts to punishment in advance of trial." *Id*. Under both theories, Plaintiff must show "(1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation." *Sanchez*, 956 F.3d at 791 (quoting *Monell*, 436 U.S. at 694). "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

The §1983 causation component requires that the plaintiff identify, with particularity, the policies or practices they allege cause the constitutional violation and demonstrate a "direct causal link." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018); *See Piotrowski*, 237 F.3d at 580. The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id*. The court may properly consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id*. The Supreme Court has described an actionable *Monell* policy as "a course of action consciously chosen among various alternatives." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d

51

791 (1985). "We do not require a plaintiff to show that a 'policy or practice [was] the exclusive cause of the constitutional deprivation.' Courts 'may . . . consider how individual policies or practices interact with one another within the larger system.'" *See Sanchez*, 956 F.3d at 791.

2. Facts Relevant to the *Monell* claims

Sheriff Rene Fuentes has been the sheriff of Starr County since November 2008 during this time has been the final policymaker for Starr County with regard to the jail. ROA.3787; ROA.3791-3795. Sheriff Fuentes is also the final policymaker regarding policies over the sheriff's deputies out on patrol. ROA.3794-3795. Sheriff Fuentes testified that he had Chief Molina writing policies for the jail and that Sheriff Fuentes would just "glance over them and then sign them off." ROA.3811. Shockingly, Sheriff Fuentes then admitted that he doesn't really read the policy, he just signs off on what Chief Molina puts forward. ROA.3812-3813; ROA.3850. Sheriff Fuentes admitted that despite his delegation of responsibility to Chief Molina, the County Commissioners have not approved or ratified his delegation of policy making authority to Chief Molina, and it is Sheriff Fuentes who has final authority on the policies he signs off on for the County. ROA.3824.

Sheriff Fuentes was the sheriff of Starr County when Marco Munoz committed suicide in the Starr County jail on May 13, 2018. ROA.3796. A special inspection report regarding thein custody death of Marco Munoz was issued stating,

"it was determined the 30-minute face-to-face observations of inmates in the area where inmates are known to be assaultive, potentially suicidal, mentally ill, who have demonstrated bizarre behavior or confined, were not conducted in accordance with Minimum Jail Standards. ROA.4360; ROA.3806-3807. Sheriff Fuentes testified that after the special inspection report came out regarding Mr. Munoz's death, Starr County changed its inmate observation policy to be in line with the Texas Minimum Jail Standards – because the policy at the Starr County Jail (written by Chief Molina and then blindly signed off by Sheriff Fuentes) was not in line with the Texas Minimum Jail Standards, resulting in Mr. Munoz's death. ROA.3808-3813. Accordingly, Starr County was aware that by failing to adequately monitor inmates, it could result in the inmate's death. *Id*. Following Mr. Munoz's death, Sheriff Fuentes did not make any changes to the way Starr County policies were created – despite knowing that the Starr County observation policy written by Chief Molina did not comply with the Texas Minimum Jail Standards. ROA.3819-3820.

Sheriff Fuentes continued to be sheriff of Starr County on August 13, 2020, when Alberto died in the Starr County jail. ROA.3814. Following Alberto's death, a jail inspection report regarding the death of Alberto was issued by the Texas Commission on Jail Standards, which stated, "Face-to-face observations were not conducted within 15 minutes as required at the time Inmate Alberto Pena was found unresponsive in the WRAP restraint system." ROA.4358; ROA.3818. Sheriff

Fuentes testified that the Starr County policy for observing inmates such as Alberto in the WRAP restraint chair was not in compliance with the Texas Minimum Jail Standards at the time Alberto was not adequately monitored and was then found unresponsive and died. ROA.3815-3817; ROA.3820; ROA.3851-3852. Sheriff Fuentes acknowledged in his deposition that these observation policies which were not in compliance with the Texas Minimum Jail Standards resulted in two in-custody deaths – Marco Munoz and Alberto Pena. ROA.3820. Sheriff Fuentes also testified that Starr County did not have a policy instructing the officers who should have been monitoring the camera of Alberto's cell, which explains why no one was monitoring the video feed. ROA.3886.

Sheriff Fuentes is responsible for the training at the Starr County Jail. ROA.3830. Sheriff Fuentes testified that he is unaware of any training on detecting head injuries in inmates, on how to determine if an inmate needed medical care due to being intoxicated on drugs or alcohol, on the effects of prolonged struggle against restraints, on detecting whether an inmate is experiencing medical distress due to a lack of oxygen, or on determining if an inmate is experiencing medical distress. ROA.3832-3834. Defendants Lopez, Joel Garza, Evelario Garza, and Cesar Juarez also testified there was no training with regard to what to do if an inmate may have had a head injury or determining if an inmate was in medical distress. ROA.3342; ROA.3382-3383; ROA.3472-3473; ROA.3554-3556. Starr County simply did not

train its jailers on what to look for to determine if these steps needed to be taken, which resulted in no medical care being provided or summoned for Alberto. Roa.3832-3834; ROA.3342; ROA.3382-3383; ROA.3472-3473; ROA.3554-3556.

Sheriff Fuentes is also responsible for the training and policies of the Starr County Patrol Division. ROA.3835. Starr County did not provide any training to patrol division deputies with regard to head injuries. *Id*. Sheriff Fuentes testified that despite it being noted that Alberto lost consciousness in the patrol car after banging his head inside of the car, all Starr County policies were complied with in not calling for an ambulance or seeking medical care for Alberto. ROA.3865.

Sheriff Fuentes testified that all Starr County policies were complied with by not providing medical care to Alberto following the initial three head strikes inside of the detox cell. ROA.3876-3877; ROA.3879. Sheriff Fuentes testified that all Starr County policies were complied with by not providing medical care to Alberto following the subsequent fourteen head strikes inside of the detox cell. ROA.3883-8384.

When asked what training Starr County provided the officers that would aid them in determining in their discretion whether or not medical evaluation should have been sought for Alberto following his loss of consciousness from the final fourteen head strikes, Sheriff Fuentes simply stated, "they had no training." ROA.3884.

55

3. <u>Application of Facts to Case Law</u>

Starr County's policies in this case can be divided into two main categories: **failure to monitor**, and **failure to provide medical care**.

### i. *Failure to monitor*

This failure to monitor meets the elements of both an episodic acts or omissions claim and a condition of confinement claim.

As to the episodic acts claim, Defendant Evelario Garza failed to ensure his subordinate jailers conducted proper observation and monitoring of Alberto through timely face-to-face checks and video monitoring **<u>because of</u>** Starr County's following unconstitutional policies with regard to that observation.

As to the conditions of confinement claim, the following policies demonstrate Starr County jail conditions, which are <u>explicit policies</u> that are <u>not reasonably related to a legitimate goal</u>. *Shepherd v. Dall. Cty.*, 591, F.3d 445, 452 (5th Cir. 2009). Conditions of confinement claims can be based on multiple interacting policies, and here, it is the explicit policies in place when someone is restrained in a restraint system known as the WRAP, then not viewed through video monitoring and also not observed with face-to-face checks in compliance with the minimum jail standards to ensure they are safe. Essentially, inmates – such as Alberto in this case – were placed in the WRAP restraint system and left unattended – with observations not occurring either by video monitoring or face-to-face checks – for extended

amounts of time that failing to comply with the Texas Minimum Jail Standards, without any legitimate reason for this extended inattention, amounting to nothing more than punishment. This is the second time this has occurred and resulted in a death due to non-compliant observation policies. *Pena Arita v. United States*, 470 F. Supp. 3d 663, 703 (S.D. Tex. 2020) ("Mr. Muñoz asphyxiated himself with the sweater and was not found until approximately 40 minutes after his death." (emphasis added)).

At the time of Alberto's death, Starr County's official policy for monitoring inmates in the WRAP restraint system – such as Alberto in this case – failed to comply with the Texas Minimum Jail Standards, due to the monitoring intervals being outside of those required by the Texas Commission on Jail Standards. ROA.3815-3817; ROA.3820; ROA.3851-3852; ROA.4358.

A knowing failure to execute policies necessary to an inmate's safety may be evidence of deliberate indifference. *Arenas v. Calhoun*, 922 F.3d 616, 624 (5th Cir. 2019). Clearly, the Texas Minimum Jail Standards are in place for inmates' safety, and in this case, Starr County failed to execute or even establish policies necessary for Alberto's safety as the observation policy here **doubled** the minimum time required. ROA.4358; ROA.3815-3816.

For deliberate indifference to be based on a single incident, "it should have been apparent to the policymaker that a constitutional violation was the highly

predictable consequence of a particular policy." *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 373 (5th Cir. 2003). Here, Sheriff Fuentes was aware that failing to adequately monitor inmates in compliance with the Texas Minimum Jail Standards could result in an inmate's death, as this is precisely what previously occurred in the Starr County Jail under Sheriff Fuentes' observation policies on May 13, 2018, when Marco Munoz committed suicide in the Starr County Jail after he was no observed in compliance with the Texas Minimum Jail Standards. ROA.3796.

"A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans v. City of Marlin, Texas*, 986 F.2d 104, 108 (5th Cir. 1993). Sheriff Fuentes also testified that Starr County did not have a policy instructing the officers who should have been monitoring the camera of Alberto's cell, which explains why no one was monitoring the video feed. ROA.3886. If there was a policy in place for someone to be watching the video feed of Alberto's cell, it would have been noticed that he stopped moving at 9:01 PM and he would have received CPR at least 11 minutes sooner (since he was not checked on until 9:12 PM). ROA.3139 at 5:44:57; ROA.3139 at 5:56:10. It is obvious that the likely consequences of not adopting a policy regarding viewing the video feed from the Detox Cell would be a deprivation of civil rights as Starr County had already seen

what happens when no one is watching the video feeds or conducting face to face checks when Marco Munoz died by suicide in the Starr County Jail. *Pena Arita*, 470 F. Supp. 3d at 703. No jailers were disciplined following the death of Mr. Munoz where he wasn't viewed via video or observed for approximately 40 minutes. ROA.3802. Similarly, no one was disciplined following Alberto's death where he was not viewed via video or properly observed. ROA.3814-3815; ROA.3818.

This failure to monitor was the moving force behind the constitutional violations in this case. The last check of Alberto's cell was at 8:53 p.m. ROA.3139 at 5:37:16. Video footage shows that Alberto stopped moving at 9:01 p.m. ROA.3139 at 5:44:57. But Alberto was not discovered to be unresponsive until a cell check at 9:12 p.m. ROA.3139 5:56:10. If Starr County's observation policy met minimum standards, Alberto would have been found nonresponsive and would have received medical attention 4 minutes earlier at 9:08 p.m. *Goodman*, 571 F.3d at 395; ROA.4358. Alberto still had a weak pulse when he was finally provided CPR; thus, earlier monitoring and intervention could have saved Alberto. ROA.3141 at 16:25-16:42. Defendant Juarez told Deputy Sosa on the day of the incident that after they started doing CPR Alberto's skin tone changed. ROA.3141 at 16:45-16:53. Accordingly, because of Starr County's policies of not adequately observing inmates via video or timely face-to-face checks, Alberto was left unattended and died.

These policies regarding failure to monitor caused Defendant Evelario Garza's deliberate indifference in supervising his subordinate officers; thus, an episodic acts or omissions claim is satisfied. There is no legitimate penological reason for these policies as they are non-compliant with the Texas Minimum Jail Standards. Thus, they act as mere punishment and a conditions of confinement claim has been satisfied.

### ii. *Failure to provide medical care*

This failure to provide medical care meets the elements of an episodic acts or omissions claim.

As to the episodic acts claim, Defendants Cervantes, Garcia, Rios, Lopez, Gonzalez, and Joel Garza, all failed to provide Alberto with medical attention amounting to deliberate indifference to Alberto's serious medical needs after seeing him strike his head causing unconsciousness **because of** Starr County's unconstitutional policies with regard to head injuries and providing medical care and attention. Further, Defendants Emilio Garza, Jesus Barrera, Cesar Juarez, and Ubaldo Suarez all failed to provide Alberto with medical attention amounting to deliberate indifference to Alberto's serious medical needs after seeing him in clear medical distress due to turning purple and having difficulty breathing **because of** Starr County's unconstitutional policies with regard to head injuries and providing medical care and attention.

60

Starr County simply did not train its jailers on what to look for to determine if steps needed to be taken with regard to medical care, which resulted in no medical care being provided or summoned for Alberto. ROA.3832-3834; ROA.3342; ROA.3382-3383; ROA.3472-3473; ROA.3554-3556.

Although an unlawful condition or practice is often explicit, a "formal, written policy is not required." *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 875 (5th Cir. 2016); see *Shepherd*, 591 F.3d at 452. As noted by the Fifth Circuit, "specific [prior] examples are not required to meet the 'conditions or practice' element" when there is <u>consistent testimony of jail employees</u>, *Montano*, 842 F.3d at 875 ("Given the striking uniformity of the jail employees' testimony, further evidence was not required for a reasonable juror to infer a *de facto* policy for conditions or practices."), or <u>the policy maker knows about a misconduct yet fails to take remedial action</u>, *Sanchez*, 956 F.3d at 793–94. <u>When multiple employees act in the same unconstitutional manner</u>, that is indicative of a *de facto* policy. *See Sanchez*, 956 F.3d at 793 (finding that evidence that the county's written policies were ignored created fact-issues as to whether the jail had a *de facto* policy of inadequately monitoring intoxicated detainees). <u>A *de facto* policy can be found when none of the jailers face any reprimand after an inmate's death</u>, or when a municipality fails to take any evident action to correct the jail's alleged deficiencies. *See Sanchez*, 956 F.3d at 793 (finding that "fail[ure] to take remedial action ... arguably shows

acquiescence to the misconduct such that a jury could conclude that it represents official policy.") (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that, because the city policymaker failed to change policies or to discipline or reprimand officials, the jury was entitled to conclude that the complained-of practices were "accepted as the way things are done and have been done in" that city)).

Consistent testimony of jail employees with regard to the lack of training supports an unconstitutional training policy in this case. *Montano*, 842 F.3d at 875. ROA.3342; ROA.3382-3383; ROA.3472-3473; ROA.3554-3556; ROA.3832-3834. As a result, Alberto was not given medical care after slamming his head a total of seventeen times in the detox cell and knocking himself unconscious on the cell floor.

The same is true for the patrol division deputies, specifically here, Defendants Cervantes, Rios, and Garcia. ROA.3346; ROA.3835-3836. As a result, Alberto was not given medical care after knocking himself unconscious in the back of the patrol car.

Further evidence of this policy is the fact that none of the jailers faced any reprimand after either Marco Munoz or Alberto Pena's' deaths. ROA.3802; ROA.3814-3815; ROA.3818; *See Sanchez*, 956 F.3d at 793; citing *Grandstaff*, 767 F.2d at 171.

Finally, <u>Sheriff Fuentes, as the policy maker, learned of this misconduct yet failed to take remedial action.</u> ROA.3865. *See Sanchez*, 956 F.3d at 793.

Accordingly, Defendants Cervantes, Garcia, Rios, Lopez, Gonzalez, Joel Garza, Emilio Garza, Jesus Barrera, Cesar Juarez, and Ubaldo Suarez all failed to provide Alberto with medical attention amounting to deliberate indifference to Alberto's serious medical needs **because of** Starr County's policy of leaving it up the jailers/deputies discretion for when medical care needs to be provided "<u>no training</u>" to aid them in this determination. ROA.3884.

Thus, the district court erred in finding the elements of the Monell claim have not been met.

## **Appellants' Third Issue**

The district court erred in dismissing the wrongful death and survival action claims, due to finding that no constitutional violations occurred. This was error.

The district court found that "for the same reasons outlined above, the Court GRANTS Defendants' motion for summary judgment as to" the wrongful death and survival actions. However, as Appellants have demonstrated above, there were in fact clearly established constitutional violations by each of the Appellees which caused the death of Alberto in this case. Accordingly, the district court erred in granting summary judgment on the wrongful death and survival actions.

CONCLUSION AND PRAYER

Appellant asks this Court to find the district court erred in granting summary judgment, find Appellees are not entitled to qualified immunity because the law was clearly established and there are material fact disputes regarding whether Appellees violated Alberto's constitutional rights, find there are material fact disputes whether Starr County maintained unconstitutional policies that resulted in Alberto's death, find the wrongful death and survival actions should not have been dismissed for the same reasons, vacate the district court's judgment, and remand this case for trial.

**PALMER PERLSTEIN**

*/s/ James P. Roberts*
JAMES P. ROBERTS
State Bar No. 24105721

15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 972.204.5452
james@palmerperlstein.com

Attorney for Appellant.

CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2025, that an exact copy of Plaintiff-Appellant's Brief was served via ECF to counsel for the Defendants-Appellees. I further certify that: (1) all privacy redactions have been made pursuant to 5th Cir. Rule 25.2.13; and (2) the electronic submission is an exact copy of the paper documents pursuant to 5th Cir. Rule 25.2.1.

*/s/ James P. Roberts*
**JAMES P. ROBERTS**
**PALMER PERLSTEIN**

CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Rule 32(a)(7)(B) because:

- This brief contains 12,103 with the exclusions under Rule 32(f) accounted for;

This brief also complies with the typeface requirements of Rule 32(a)(5) and the type requirements of Rule 32(a)(6) because:

- This brief has been prepared in Times New Roman font, a proportionally-spaced typeface, using Microsoft Word 2010 with 14-point font for the text and 12-point font for the footnotes.

*/s/ James P. Roberts*
**JAMES P. ROBERTS**
**PALMER PERLSTEIN**